JS - 6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: CV 08-1249 ABC |
| | ) | CR 05-982 ABC |
| Plaintiff, | ) | |
| | ) | **ORDER DENYING MOTION TO VACATE,** |
| v. | ) | **SET ASIDE, OR CORRECT SENTENCE** |
| | ) | |
| MAMDOUH S. BAHNA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pending before the Court is Defendant Mamdouh S. Bahna's
("Defendant" or "Bahna") Motion to Vacate, Set Aside, or Correct
Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. § 2255
(the "Motion").  The Government filed an Opposition, and Defendant
filed a Reply.  The Court conducted an evidentiary hearing on November
12, 2008.  The parties agreed during the September 19, 2008 status
conference that the evidentiary hearing would be limited to the cross-
examination of witnesses based upon the testimony in their
declarations.  At the hearing, the Court also heard testimony from Dr.
Annette L. Ermshar and FBI Special Agent Botello, who had not
previously submitted declarations.  Upon consideration of the
testimony and exhibits received at the hearing, the parties'

submissions, and the case file, the Court hereby **DENIES** Defendant's Motion.

## I.  BACKGROUND

**A.  Factual and Procedural Background**

**1.  Pre-Trial Events: Defendant's Indictment and Health Issues; Continuations of the Trial.**

On October 11, 2005, Defendant was indicted on charges of conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 371 and 1349, and health care fraud in violation of 18 U.S.C. § 1347.  (CR 1.[1])  Trial was initially set for May 16, 2006.  However, the trial was continued at Defendant's request to October 17, 2006 (CR 74) and then to February 6, 2007 (CR 88).

Thereafter, around November 26, 2006, Defendant suffered a stroke.  (Exh. 27, ¶ 14.)  The stroke did not require Defendant to be hospitalized and Defendant's doctor did not initially detect mental impairment.  However, based upon Defendant's representations that he suffered memory impairment and cognitive deficits as the result of the stroke, that he intended to undergo therapy for these problems, and that persons with his condition typically maximize their recovery within six months, the Court, out of an abundance of caution, continued the trial date to July 31, 2007.  (CR 151.)

On June 20, 2007, Defendant sought once again to continue the trial date based on his mental impairments.  (CR 187, 188.)  Although Defendant contended that he was impaired, he did not argue that he was incompetent and did not invoke a right to relief under 18 U.S.C. § 4241, which governs competency to stand trial.  Defendant's expert,

---

[1]  "CR" refers to the clerk's record in <u>United States v. Mamdouh S. Bahna, et al.</u>, Case No. CR 05-982 ABC.

2

1  forensic psychologist Annette Ermshar, Ph.D., performed

2  neuropsychological tests on Defendant.  (Exh. 32.)  Dr. Ermshar opined

3  that Defendant suffered from cognitive defects, but did not conclude

4  that Defendant was incompetent.  (Id. at 10.)  Indeed, Dr. Ermshar

5  indicated that Defendant had a solid layman's grasp of the nature of

6  the charges and the proceedings.  (See id. at 8.)

7      The Government opposed Defendant's motion to continue the trial

8  on numerous grounds.  (CR 190, 193, 194.)  Among the evidence the

9  Government presented in its opposition was the report of its expert,

10 neuropsychologist Robert J. Sbordone, Ph.D.  Dr. Sbordone performed a

11 battery of tests on Defendant and concluded that he was competent and

12 was "trying to feign cognitive impairment or exaggerate whatever

13 residual cognitive impairments he currently has."  (CR 194 at 153.)

14 Thereafter, Defendant filed a reply wherein he asked the Court to take

15 the continuance motion off calendar because the parties were in the

16 process of resolving the case.  (CR 192.)

17      **2.  The Plea Agreement**

18      On July 11, 2007, Defendant executed a plea agreement in which he

19 agreed to plead guilty to count eight of the indictment.  (CR 197;

20 Exh. 37.)  The plea agreement informed Defendant that he faced a

21 maximum sentence of 10 years in prison.  (Exh. 37, ¶ 4.)  It also

22 informed him that the Court was "free to exercise its discretion to

23 impose any reasonable sentence up to the maximum."  (Id. at ¶ 11.)

24 With respect to any sentencing prediction his counsel may have made,

25 the plea agreement stated unequivocally that:

26          No one -- not the prosecutor, defendant's
           attorney, or the Court -- can make a binding
27          prediction or promise regarding the sentence
           defendant will receive, except that it will be
28          within the statutory maximum.

(Id. at ¶ 22.)  The agreement also made it clear that Defendant could not withdraw his plea, even if the Court ignored any sentencing recommendation or stipulation and imposed a sentence up to the statutory maximum.  (Id.)

In the plea agreement, Defendant stipulated that his conduct involved an intended loss of $2.4 million and caused an actual loss of almost $1 million.  (Id. at ¶¶ 8, 12, and Exh. A "Factual Basis - Mamdouh S. Bahna," at 3.)  He agreed to pay restitution in the amount of $990,518.60.  (Id. at ¶ 8.)  He also acknowledged not only that the government was free to argue that additional sentencing factors applied but also that the government had given him notice that it expected to argue that additional sentencing factors applied to his case.  (Id. at ¶ 12.)  He also agreed that the government had the right to argue for a sentence outside the guidelines range.  (Id. at ¶ 13.)

Furthermore, in signing the agreement, Defendant averred that he had read and "carefully discussed every part of it" with his attorney; that he understood the terms of the agreement and voluntarily agreed to them; that his attorney had advised him "of the Sentencing Guideline provisions, and of the consequences of entering into this agreement;" and that "no promises or inducements have been made to me other than those contained in this agreement."  (Id. at p. 12.)

To ensure that Defendant was competent to plead guilty, given Defendant's earlier claims about his mental status, Defendant was examined on July 9, 2007 by his own expert, Dr. Ermshar, who determined that Defendant was competent to enter a guilty plea and did understand the consequences of his actions.  (Exh. 34.)  This report was provided to the Court at Defendant's July 12, 2007 change of plea

hearing. (CR 206; Transcript of July 12, 2007 Change of Plea Hearing ("COP Tr.") (attached as Exh. D to Def.'s Mem. in Supp. of Mot. to Vacate, Set Aside or Correct Sentence ("Def.'s Mem.")), at 5-6.)

### 3. Change of Plea Hearing

On July 12, 2007, Defendant entered his plea of guilty. (CR 206.) At the change of plea hearing, Defendant was again fully informed of the potential consequences of his plea. Furthermore, before engaging in the plea colloquy, the Court considered the evidence of Defendant's competence and made a specific determination that Defendant was competent to enter a guilty plea. (COP Tr. at 10-12.)

The plea colloquy was thorough and deliberate. The Court placed Defendant under oath and described the nature of the charge and the 10 year statutory maximum sentence. Defendant stated that he understood them. (COP Tr. at 13-21.) Defendant explicitly stated that he had had enough time to discuss those matters with his attorney. (Id. at 21.) He also stated that he had had enough time to go over the facts of the case and any defenses with his attorney. (Id.) The factual basis for the plea was recited in detail, including the actual and intended loss amounts and the facts establishing the scope of Defendant's conduct and his intent to defraud insurance companies. (COP Tr. at 22-25.) Defendant acknowledged that everything government counsel stated about him and his conduct and intent was true and correct and that he was pleading guilty because he was in fact guilty. (COP Tr. at 25.)

Defendant stated under oath that he had read the plea agreement, discussed all of its terms with his counsel, and did not need any more time to go over it with his counsel. (COP Tr. at 28.) The Court

specifically advised Defendant he was giving up his appeal rights.
(Id.)  The Court explained that it was not a party to the agreement
and was not bound by any stipulations regarding sentencing.  (COP Tr.
at 29.)  The Court also described the sentencing process, including
the possibility that the Court could deviate upward or downward from
the Guidelines range.  (COP Tr. at 29-30.)  With respect to sentencing
risk, the colloquy proceeded as follows:

> THE COURT: So, also, do you understand that,
> obviously, no one can tell you today what advisory
> guidelines will apply and no one can tell you
> today what your sentence will be; do you
> understand that[?]
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: However, do you also understand that
> the Court, if it exercises its discretion and
> imposes a sentence higher than the sentencing
> range suggested by the guidelines -- and, in fact,
> the Court has the discretion to impose a sentence
> up to the maximum in the statute -- that does not
> provide a basis for you to withdraw your plea
> because you're unhappy with the sentence; do you
> understand that?
>
> THE DEFENDANT: Yes, Your Honor.

(COP Tr. at 30:15-31:3.)

Defendant also assured the Court, twice, that none of the drugs
he was taking affected his "mental capacity" or ability to understand
the proceedings.  (COP Tr. at 31-32.)  Defendant also told the Court
that he believed his counsel had fully advised him concerning his plea
and that he was satisfied with counsel's performance and
representation.  (COP Tr. at 33.)  Just before entering his plea,
Defendant again told the Court that he had had enough time to discuss
the matter with Mr. Bird.  (Id.)

**4.  Subsequent Proceedings and Sentencing**

The Presentence Investigation Report ("PSR") was filed on October

1, 2007.  The PSR calculated Defendant's Sentencing Guidelines range at 87 to 108 months imprisonment, based on a total offense level of 29 and a criminal history category I.  (PSR ¶ 167.)

On October 25, 2007, Pretrial Services initiated bail revocation proceedings against Defendant.  (CR 258; see also 10/24/07 Pretrial Services Letter.)  Pretrial Services expressed concerns that Defendant was "unamenable to supervision" because he repeatedly violated his electronic monitoring program, was hostile with the Pretrial Services Officer, and refused to attend a workshop on successful incarceration.

On October 30, 2007, the government filed a request for detention pending sentencing, arguing that Defendant was an extreme flight risk despite his substantial bond, because, among other things, he was now directly confronting the prospect that he would face considerable time in custody.  (CR 243.)

On October 31, 2007 and November 13, 2007, the Court conducted hearings on bail revocation.  (CR 247, 268.)  At these hearings, the Government argued, in Defendant's presence, that one of the reasons he was a flight risk was that it was now patently clear that Defendant faced a potentially long prison sentence.  Defense counsel argued that Defendant was well aware that he faced a substantial sentence.  The Court did not revoke Defendant's bail at either hearing, and he remained on pretrial supervision.

Meanwhile, beginning October 16, 2007 (CR 232), Bahna's co-defendant, William Hampton, was tried before a jury on numerous counts of health care fraud and conspiracy to commit health care fraud, including a number of counts with which Bahna had also been charged. On November 27, 2007, Hampton was found guilty of only one count -- one with which Bahna had not been charged.  (CR 276.)  The Hampton

jury could not reach a verdict on the counts involving Bahna's clinic, the Bel Air Surgical Institute.  After learning of the Hampton verdict, Bahna sought to convince his attorneys to renegotiate the amount of restitution he had agreed to pay as part of his plea agreement.  (April 22, 2008 Bird Decl., Exh. 7.)  He had resisted paying any restitution while awaiting the Hampton verdict, despite his attorneys' insistence that going into his sentencing without having paid restitution would not find sympathy with the Court.  (Exh. 8, ¶ 45.)

On December 10, 2007, the Court conducted Defendant's sentencing hearing.  (CR 302; Transcript of Dec. 10, 2007 Sentencing Hearing ("Sent. Tr.") (attached as Exh. B to Def.'s Mem.).)  Defendant affirmed that he had read the PSR and had had enough time to discuss it with his attorney.  (Sent. Tr. at 5.)  The PSR calculation of an 87 to 108-month sentence and the Government's recommendation for an 87-month sentence were discussed at length.  Mr. Bird asserted that:

> Dr. Bahna understands, as he is here today with us, that he is responsible for having brought all this on himself. He knows, in the depth of his soul and heart that, in the next few moments, the -- a determination will be made, which will in most likelihood determine where and even how he may leave us from this life.

(Sent. Tr. at 10.)

Defendant was offered an opportunity to speak and did address the Court.  (Sent. Tr. at 70-71.)  He did not contradict his attorney's statements or express any surprise that a lengthy sentence was being discussed.  (Id.)

At the conclusion of the hearing, the Court sentenced Defendant to 58 months imprisonment, substantially less than the 87 months recommended by the government.  (Sent. Tr. at 86-87.)

**B.   The Instant Motion**

In his Motion, Defendant urges the Court to vacate his 58-month sentence of imprisonment on the ground that he received ineffective assistance of counsel.  Defendant contends that his attorneys failed to inform him of the penal consequences of his plea and failed to correct Defendant's incorrect belief about the kind of sentence he could receive.  In brief, Defendant contends that although he knew there was a risk that pleading guilty could result in imprisonment, he contends that he "had no idea that [he] might go to jail for much more than a year." (Exh. 27, ¶ 22.)  In support of this contention, Defendant submitted his own declarations,[2] as well as a declaration from his wife (Exh. 30), three reports prepared by Dr. Ermshar (Exhs. 32, 34, 45), and earlier declarations signed prior to his guilty plea by his then-attorneys, Terry Bird (Exh. 52) and Jason Kogan (Exh. 53).

Defendant points to two interrelated circumstances that resulted in his alleged misunderstanding of the consequences of his plea.  First, Defendant argues that Mr. Bird gave him the impression that a lengthy sentence was unlikely and pressured him into taking the plea.  Second, Defendant argues that the impairment to his mental abilities that he suffered as a result of a stroke and seizure made it very

---

[2]Defendant prepared four separate declarations in connection with this matter, although not all were ultimately filed with or considered by the Court:  February 22, 2008 Declaration of Dr. Mamdouh S. Bahna, M.D. (Exh. 27); August 29, 2008 Declaration of Dr. Mamdouh S. Bahna, M.D. re: Reply (Exh. 28); August 13, 2008 Declaration of Dr. Mamdouh S. Bahna, M.D. re: Recusal Motion(Exh. 29); and November 11, 2008 Supplemental Declaration of Dr. Mamdouh S. Bahna (not admitted).  The August 13, 2008 Declaration was stricken, and disregarded by the Court.  Courtesy copies of the November 11, 2008 Declaration were provided to the Court in advance of the hearing, but Defendant's attorney informed the Court at the hearing that this Declaration had not been and would not ever be filed.  Further, Defendant's attorney explicitly disavowed some of the statements contained therein.

difficult for him to understand any advice given to him, made it
difficult for him to think, and filled him with fear of going to trial
because of the additional risks a trial would pose to his health.
Furthermore, Defendant states that while his mental condition was not
so impaired as to render him incompetent to enter a plea,[3] it imposed
on counsel a duty to go over more carefully the consequences of
pleading guilty to ensure Defendant understood and absorbed the
information and could intelligently enter a plea.  Defendant argues
that had he understood that pleading guilty could result in up to ten
years' imprisonment, he would have chosen to go to trial instead.

In support of its opposition to the Motion, the Government
submitted declarations dated April 22, 2008 from Mr. Bird (Exh. 8) and
his co-counsel in this case, Mr. Kogan (Exh. 9), both partners at the
law firm Bird Marella Boxer Wolpert Nessim Drooks & Lincenberg.  Both
Mr. Bird and Mr. Kogan contradict Defendant's assertions that they
failed to sufficiently inform him of the consequences of the plea.
Both attorneys provide detailed accounts of their efforts to inform
Defendant throughout the case of the consequences of pleading guilty,
including how the sentencing factors and guidelines could affect his
sentence; the penal and health risks of not pleading guilty compared
with those of accepting the plea; and their opinion of the merits of

---

[3]   Defendant has taken inconsistent positions about his
competency at the time he entered his plea.  In his Reply, Defendant
specifically asserts that "[he] is not challenging the court's finding
that he was competent to enter a plea." (Reply 5:25-26.)  However, in
his November 11, 2008 Declaration, Defendant stated that he does "not
believe I was competent to make the decision to change my plea at that
time." (Nov. 11, 2008 Decl., ¶ 8.)  At the hearing on Defendant's
Motion, Defendant's current attorney, Victor Sherman, stated that this
Declaration had been "inartfully" drafted, and would not be filed.  On
cross-examination, however, Defendant testified that he did not think
he was competent at the time he entered his plea.

his defense.  Mr. Bird and Mr. Kogan also explained that, when he pled guilty, Defendant was aware that he could receive a sentence above the 58-month term imposed upon him.

Because Defendant and his former attorneys assert vastly different facts relating to the attorneys' representation and Defendant's understanding of the plea, the Court held an evidentiary hearing in part to assess the witnesses' credibility.  See Earp v. Orniski, 431 F.3d 1158, 1169-70 (9th Cir. 2005) (discussing circumstances under which a court should conduct a hearing to assess credibility in the context of section 2255 motion.)  Defendant called Dr. Ermshar, Mrs. Hanny Bahna, Mr. Bird (whose testimony was limited to his June 20, 2007 Declaration (Exh. 52)), Mr. Kogan (whose testimony was limited to his June 20, 2007 Declaration (Exh. 53)), and Defendant himself.  The government called Special Agent Botello of the FBI.  Defendant chose not to cross-examine either Mr. Bird or Mr. Kogan regarding the April 22, 2008 Declarations the government had submitted with its opposition to Defendant's Motion; those Declarations therefore stand unrebutted.

Having reviewed each declaration and having observed each witness's testimony, the Court finds that Defendant's testimony attributing various failures to his attorneys, and asserting that he did not know what he was getting into when he signed his plea agreement, is wholly incredible.  His claim that he did not know he "might go to jail for much more than a year" (Exh. 27, ¶ 22) is simply not believable in light of Dr. Ermshar's notes and testimony, Mr. Bird's and Mr. Kogan's testimony, and Defendant's own statements under oath at the plea colloquy.  Further, Defendant has repeatedly changed his story as to his competency at the time of the plea, claiming

sometimes that he was competent but not fully informed by counsel, and sometimes that he was not competent at all.  He is willing to change his version of the story even in the face of his own attorney's disavowal of Defendant's claims of incompetency.  Defendant's testimony at the hearing on the instant Motion is inconsistent with his own previous statements, and neither version of his story is consistent with the weight of the evidence.  In addition, Defendant claimed at the hearing that he had lied during the plea colloquy in order to obtain a result he then considered desirable -- not a tactic likely to inspire confidence in his general truthfulness.

Nor did the Court find the testimony of Defendant's wife, Mrs. Hanny Bahna, to be credible.  In particular, the Court gave little weight to her assertion that Defendant's attorneys had refused his request to reconsider the plea agreement before Defendant entered his plea.  (See Exh. 30, at ¶ 9.)  On cross-examination, the only conversation Mrs. Bahna could recall regarding Defendant's change of heart about pleading occurred sometime after the plea was entered, not before.

In contrast, the Court finds the testimony of Mr. Bird and Mr. Kogan to be credible.  Both of these attorneys set forth numerous, specific instances in which they counseled Defendant on the consequences of the plea agreement, including the potential sentence he could receive under it.  This weighs heavily in favor of the veracity of their account, especially when contrasted with Defendant's vague assertions to the effect that he was "led to believe" his sentence would be light.

The Court also finds that Defendant's averments that he was wholly dependent upon counsel to make decisions for him and could not

think for himself lack credibility.  In this regard, both Mr. Bird and Mr. Kogan testified that Defendant was actively involved in negotiating the plea agreement.  For example, Mr. Kogan states that Defendant "asked questions, suggested changes, reviewed loss amounts, and made a correction on one patient to make it possible for the restitution amount to be decreased to just under $1 million." (Exh. 9, ¶ 22; see also ¶¶ 23-24.)  Defendant proposed changes to the factual basis of the plea; some of these suggestions were incorporated into the agreement. (Id. at ¶ 23.)  Furthermore, Defendant selected the count to which he pled guilty; this count was different from the one counsel originally suggested. (Id. at ¶ 24.)

Counsel's account that Defendant participated intelligently in the plea process is further supported by a November 2007 email exchange between Defendant and an attorney from whom he sought a second opinion regarding whether the outcome of his co-Defendant Dr. Hampton's trial could give him any basis for renegotiating the $1 million restitution to which he agreed in the plea.  In this email exchange, attached as exhibit 7 to the Government's opposition, Defendant explained the outcome of Dr. Hampton's trial and why he thought that outcome could have an impact on whether Defendant would be held responsible for the full restitution.  Defendant's idea was that because the jury was hung on the count against Dr. Hampton that related to the one count to which Defendant pled, that would give Defendant a basis for challenging the restitution amount.  That Defendant was able to formulate this question reflects an ability to understand nuances, apply reason, and, simply put, to think critically; that Defendant was able to articulate these rather complex thoughts clearly also reflects that he was able to communicate with

his counsel if he had needed more explanation of the plea he accepted
only several months prior.  Furthermore, because this evidence
demonstrates that Defendant had the mental capacity sufficient to
understand counsel's advice, it contradicts his current position that
he lacked that capacity, and therefore further undermines the overall
credibility of his testimony in this proceeding.

Having made this credibility determination, the Court finds the
following facts material to Defendant's argument that his acceptance
of the plea was not knowing and intelligent due to the combined effect
of his mental impairments and his counsel's alleged failure to
sufficiently advise him of the consequences of accepting the plea.

**C.  Facts Relating Specifically to Assistance Defendant Received in
Connection with His Decision to Accept the Plea.**

Early in the case, before the indictment was issued, Mr. Bird
conducted an investigation and determined that, in light of the
Government's evidence (including recordings of conversations between
Defendant and an FBI informant), Defendant's poor performance in a
mock cross-examination, and polygraph results that were not favorable
to Defendant, winning the case would be difficult.  (Exh. 8, ¶¶ 4-10.)
Mr. Bird advised Defendant that he should seriously consider the pre-
indictment plea offered by the government in August 2004, and that he
was unlikely to receive as favorable an offer later in the case.  (Id.
at ¶ 9.)  The August 2004 plea offer, attached as exhibit 1 to the
April 22, 2008 Bird Declaration, set out a sentencing guidelines range
of 24-30 months imprisonment.  Mr. Bird also advised Defendant that in
order to plead guilty, he would have to admit that he was in fact
guilty of a crime, and that if he could not so admit his guilt, he
could not plead guilty because the Court would not accept it and Mr.

1  Bird could not in good faith participate in the plea.  (Id. at ¶ 10.)
2  Defendant refused to acknowledge that he had done anything wrong and
3  did not accept the pre-indictment plea.  (Id. at ¶ 11.)[4]

4      Defendant was indicted on October 11, 2005, and he was given the
5  opportunity to self-surrender.  (Id. at ¶ 15.)  However, instead of
6  surrendering on the set date, Defendant fled to Egypt.  (Id. at ¶ 16.)
7  Upon his return to the United States, Defendant was arrested at the
8  airport.  (Id. at ¶ 16.)

9      Thereafter, as the case progressed into the fall of 2006, Mr.
10  Bird advised Defendant that, based on the Government's evidence
11  against him, its case was getting stronger.  (Id. at ¶ 18.)  Then, in
12  late November 2006, Defendant suffered a stroke.  Shortly thereafter,
13  on December 11, 2006, the Court issued its rulings on the motions in
14  limine; overall, they were unfavorable to Defendant.  (Id. at ¶ 19.)

15      Mr. Bird and Mr. Kogan again counseled Defendant to consider a
16  plea.  (Id. at ¶ 20; Exh. 9, ¶ 7.)  Mr. Bird stated that because he
17  believed the evidence against Defendant was overwhelming, he thought
18  Defendant would be convicted and would spend much more time in prison
19  on a conviction following trial, than if he entered a plea.  (Exh. 8,
20  ¶ 20.)  Mr. Bird also stated his opinion that the stress of a trial

21

22

---

23  [4]  With respect to this August 2004 plea offer, Defendant states
    simply that Mr. Bird "advised me not to accept it.  Following Mr.
24  Bird's counsel, I declined the Government's offer."  (Exh. 27, at
    ¶ 5.)  As discussed above, the Court finds Mr. Bird's account -- that
25  he advised Defendant to seriously consider the August 2004 plea -- to
    be more credible.  In his Reply Declaration, Defendant characterizes
26  Mr. Bird's advice as being that Defendant "was not ready to plead."
    (Exh. 28, at ¶ 22.)  However, this characterization is not
27  inconsistent with Mr. Bird's account, which is that, while he advised
    Defendant to seriously consider the plea, he also told Defendant he
28  could not plead guilty if he could not admit his guilt.

1  would jeopardize Defendant's health.  (Id.)[5]

2      After his stroke, Defendant repeatedly stated that he intended to

3  plead guilty, but he kept putting it off.  (Id. at ¶ 21.)  Sometime in

4  early 2007, Defendant told counsel to stop preparing his case for

5  trial so they wouldn't spend too much money.  (Exh. 9, ¶ 8.)  Although

6  it was more difficult to work with Defendant immediately following his

7  stroke because Mr. Bird sometimes had to explain things more slowly or

8  repeat himself, Defendant insisted on making his own decisions and

9  exercising his own judgment, after getting legal advice, through the

10  end of the case.  (Id. at ¶¶ 21, 22; Exh. 8, ¶ 22.)

11      Thereafter, in June 2007, Mr. Bird told Defendant that he should

12  not delay his change of plea any longer: the Court had granted

13  multiple continuances of the trial date, and Mr. Bird advised that it

14  seemed unlikely that the Court would grant a further continuance

15  absent a finding of incompetency.  (Id. at ¶ 24.)  However, Defendant

16  did not want to file a competency motion, and Mr. Bird did not think

17  it likely to succeed, given the defense expert's assessment of

18  Defendant's mental condition.  Defendant then told counsel to pursue a

19

20      [5]  Defendant concedes that this account of the advice Mr. Bird
gave him is accurate as far as it goes, but contends that Mr. Bird
21  also told him that he would likely die if he went to trial.  Defendant
attempts to fault Mr. Bird for so advising him of the effects that
22  going through trial could have on his already-deteriorated health,
arguing that it made him too fearful to do anything but accept a plea.
23  However, nothing in the record suggests that such an assessment was
incorrect.  Indeed, ever since his November 2006 stroke, Defendant has
24  relied on his poor state of health to seek continuances of the trial
date, bail, leniency in his sentence, and other accommodations.
25  Furthermore, advising a defendant of all the consequences of going to
trial -- beyond the strictly legal consequences -- is one hallmark of
26  effective counsel.  If Defendant felt pressured by his health to avoid
trial, that was not the fault of his attorneys, but the bad luck of
27  ill health.  "[B]eing forced to choose between unpleasant alternatives
is not unconstitutional."  United States v. Kaczynski, 239 F.3d 1108,
28  1115-16 (9th Cir. 2001).

plea agreement.  (Id.)

Following these discussions with Defendant, in late June 2007, Mr. Bird advised AUSA Woodhead that Defendant was interested in resolving the case by a guilty plea and asked her to let him know what kind of plea the Government was willing to offer.  (Id. at ¶ 23.) This communication was initiated only after he and Defendant discussed entering a plea for months, and after Defendant repeatedly made it clear that he would plead.  (Id.)

Between June 25 and 29, 2007, Ms. Woodhead provided counsel with advisory sentencing guideline calculations, a list of all the factors the Government considered applicable, a summary of the Government's loss calculations, and a proposed plea agreement.  (Id. at ¶ 25.)  A copy of these materials was sent to Defendant.  (Exh. 9, ¶ 13.)

Counsel state that they discussed the Government's proposal and the entirety of the plea process with Defendant multiple times during the course of negotiating the agreement, both on the telephone and in person.  (See, e.g., id. at ¶ 21.)  Furthermore, Mr. Kogan states that he reviewed the Government's sentencing calculations even more slowly and methodically that he normally would with a client in a similar situation.  (Id. at ¶ 13.)  Specifically, shortly after receiving the Government's sentencing calculations, Mr. Kogan reviewed with Defendant each of the Government's adjustments, the loss amount and where it placed him on the guidelines, and explained that the government was asking Defendant to stipulate to an offense level of 22, which corresponded to a sentencing range of 41 to 51 months.  (Id. at ¶¶ 14-15.)  Counsel discussed each of the other adjustments identified in the Government's sentencing factors and loss calculation, and how these would apply to Defendant's case; explained

that the Government could argue for enhancements to his sentence; and explained that the Government would not agree in advance to forego any of the adjustments. (Id. at ¶¶ 16-18.) Finally, counsel advised Defendant that the application of all the adjustments could result in a sentence of 108 to 135 months; they also noted that there were some grounds for arguing for a lower sentence. (Id. at ¶¶ 18-19.)

Thereafter, once they received the Government's proposed plea agreement on June 29, 2008, Mr. Bird and Mr. Kogan reviewed the agreement line by line with Defendant, and answered Defendant's numerous questions about the plea agreement and the factual basis. (Exh. 8, ¶ 26.) Counsel again discussed all of the factors that would bear upon Defendant's sentence, including the sentencing guidelines, and explained the base level, loss amount, stipulated and potential adjustments, the guidelines level that corresponded to them, and the fact that there was no agreement on the adjustments. (Exh. 9, ¶ 21.) Counsel informed Defendant that even if the defense and the Government agreed to the plea, the Court was not bound by it and would determine the ultimate sentence, up to the statutory maximum of 10 years. (Id.) Finally, counsel reviewed the appellate waiver with Defendant and explained how both sides were waiving the right to appeal any sentence based upon an offense level of 27 or below, which corresponded to a prison term of 79 to 87 months. (Exh. 8, ¶ 34.) Counsel stated that for all intents and purposes, this meant there would be no appeal. (Exh. 9, ¶ 27.) Throughout this process, Defendant was actively involved: asking questions, seeking more information, suggesting changes, and reviewing loss amounts. (Id. at ¶ 22.) Mr. Kogan states that although Defendant had a seizure in June 2007, he did not observe any adverse impact on Defendant's mental condition; nor did Defendant

indicate that his medications were affecting his ability to comprehend his situation or make the decisions he was making.  (Id. at ¶ 12.)

Defendant himself selected the count (count 8) to which he pled guilty; notably, this count was different from the one counsel originally suggested.  (Id. at ¶ 24.)  Counsel asked Defendant whether there was a basis for the plea to count 8 and advised him that he could not make false admissions just to enter a plea.  (Id. at ¶ 25.) Defendant said there was a factual basis for the plea and that he did admit it, and he never told counsel that he disagreed with anything in the final factual basis.  (Id.)

On July 3, 2007, Mr. Bird and Mr. Kogan met with Defendant, and again explained the sentencing process; how the guidelines work; that the guidelines were advisory; that adjustments could be made to the sentencing guidelines, including loss; and how adjustments in guideline levels corresponded with additional months of incarceration. (Id. at ¶ 28.)  Counsel also advised Defendant that he could receive a decrease of two or three levels for acceptance of responsibility if he pled prior to trial.  (Id.)

In sum, Mr. Bird and Mr. Kogan advised Defendant that he would go to prison for a long time if the Court applied all of the adjustments and enhancements and did not reduce the sentence based on other considerations, and, specifically, that the Court could impose a sentence of up to the statutory maximum of 10 years.  (Exh. 8, ¶ 29.) Mr. Kogan specifically recalls that he had the Guidelines Manual with him when discussing Defendant's possible sentence, and that he used the chart on the back of the manual showing the sentence ranges based upon offense levels.  (Exh. 9, ¶ 28.)  Mr. Kogan offered to let Defendant review the pertinent pages of the manual, but Defendant

1   declined the offer.  (Id.)  Mr. Bird specifically denies that he ever

2   "told [Defendant] or led him to believe that one year was some sort of

3   cap on his sentence.  In fact, [he] made it very clear to [Defendant]

4   that he had no way of promising him any particular sentence."  (Exh.

5   8, ¶ 29.)  Mr. Bird denies that either he or Mr. Kogan made any

6   promises or representations regarding the likely sentence and did not

7   tell Defendant "what his sentence would be."  (Id. at ¶ 31.)[6]  During

8   the plea process, Defendant also consulted with Patrick Moore, a

9   sentencing consultant.  (Id. at ¶ 33.)

10      On July 9, 2007, Defendant and his wife met with Mr. Kogan and

11   Mr. Bird.  They again reviewed the plea agreement, what he was

12   pleading to, the potential sentence, and discussed his health.  (Exh.

13   9, ¶ 30.)  Defendant asked questions, and counsel answered them.

14   Counsel also advised Defendant that if he did not want to plead

15   guilty, he needed to let them know then so they could prepare for

16   trial.  Defendant stated he wanted to wait for Dr. Ermshar's report

17   regarding competency and discuss it with his wife.  After Dr.

18   Ermshar's report was received, Defendant signed the agreement, on July

19   11, 2007.  (Id.)

20      The next day, July 12, 2007, Defendant was scheduled for his

21   change of plea hearing.  Mr. Bird met him at the courthouse

22   beforehand, for approximately 30-60 minutes.  (Exh. 8, ¶ 39.)  Mr.

23   Bird explained the change of plea process.  Mr. Bird states that

24   contrary to Defendant's assertions in his declaration, Defendant did

25

26      [6]  Defendant concedes that he was told the maximum sentence was
ten years, but states that he "was clearly told that [he] would not
27   face such a sentence."  (Exh. 28, ¶ 28.)  Defendant also denies that
he was ever told the number of months to which his possible offense
28   level would correspond.  (Exh. 27, ¶ 23; Exh. 28, ¶ 29.)

not tell Mr. Bird that he had had a change of heart or that he did not want to go through with the change of plea. (Id.) Furthermore, Mr. Bird denies Defendant's accusations that he (Mr. Bird) became emotional, told Defendant it was too late to change his mind, or talked him into going forward with the change of plea. (Id.) The change of plea hearing proceeded as described above. (Supra Part I.A.3.)

## II.   DISCUSSION

### A.   Legal Standard

Defendant is moving to vacate his sentence on the ground that he received ineffective assistance of counsel in connection with his decision to plead guilty, and that this resulted in the entry of a guilty plea that was neither knowing nor voluntary. (Def.'s Mem. at 1.) Where a defendant "is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).

A two-step analysis governs every ineffective assistance of counsel claim. Strickland v. Washington, 466 U.S. 668, 687 (1984). First, Defendant must prove that his attorney's representation fell below an objective standard of reasonableness. Id. at 687-88, 690. In order to establish this, he must identify the acts or omissions that rendered the representation objectively unreasonable. Id. at 690. Second, he must show that he was prejudiced by his counsel's deficient performance. Id. at 693. If Defendant fails to prove both elements, the Court may reject his claim upon finding that counsel's

1  performance was reasonable or that the claimed error was not

2  prejudicial.  Id. at 697.

3      The two-part Strickland test applies not only to claims of

4  ineffective assistance of counsel during trial, but also to claims of

5  ineffective assistance during the plea process.  Hill, 474 U.S. at 58.

6  In claims arising out of the plea process, a defendant must

7  demonstrate that (1) counsel's performance fell below an objective

8  standard of reasonableness and (2) a reasonable probability exists

9  that, but for counsel's errors, the defendant would not have accepted

10  the plea agreement.  Id. at 57, 59; see United States v. Davis, 428

11  F.3d 802, 806 (9th Cir. 2005).  As used in this context, a "reasonable

12  probability" does not require the defendant to show by a preponderance

13  of the evidence that he would have foregone the plea agreement and,

14  instead, insisted on going to trial.  See Jennings v. Woodford, 290

15  F.3d 1006, 1016 (9th Cir. 2002).  Rather, the Supreme Court defines "a

16  reasonable probability" as a "probability sufficient to undermine

17  confidence in the outcome."  Strickland, 466 U.S. at 694.

18      "A claim of ineffective assistance may be used to attack the

19  voluntariness and hence the validity of a guilty plea."  United States

20  v. Keller, 902 F.2d 1391, 1394 (9th Cir. 1990).  In general, the test

21  for determining the validity of a guilty plea is "whether the plea

22  represents a voluntary and intelligent choice among the alternative

23  courses of action open to the defendant."  North Carolina v. Alford,

24  400 U.S. 25, 31 (1970).  The transcript of the plea hearing plays a

25  significant role in this determination:

26          [T]he representations of the defendant, his
            lawyer, and the prosecutor at such a hearing, as
27          well as any findings made by the judge accepting
            the plea, constitute a formidable barrier in any
28          subsequent collateral proceedings. Solemn

22

> declarations in open court carry a strong
> presumption of verity. The subsequent presentation
> of conclusory allegations unsupported by specifics
> is subject to summary dismissal, as are
> contentions that in the face of the record are
> wholly incredible.

Blackledge v. Allison, 431 U.S. 63, 73-74 (1977); see also, United States v. Rubalcaba, 811 F.2d 491, 494 (9th Cir. 1987).  It is worth noting that the test for whether to allow a defendant to withdraw a guilty plea before sentencing is not the same as that for setting aside a plea after sentencing.  Davis, 428 F.3d at 806.  Thus, if Defendant had moved to withdraw his plea prior to sentencing, he would not have had to show that his plea was invalid.  Id.  Before sentencing, the question is "whether the defendant has shown a fair and just reason for withdrawing his plea even if the plea is otherwise valid."  Id.  However, the invalidity standard does apply after a defendant has been sentenced.  Id.

**B.   Application**

Here, Defendant's ineffective assistance of counsel claim fails because he cannot prove that his counsel's performance fell below an objective standard of reasonableness.  Furthermore, from the entire record of this case, the Court finds that the plea represents a voluntary and intelligent choice among the alternative courses of action that were open to Defendant.

**1.   Counsel's Representation Was Not Ineffective.**

Insofar as Defendant asserts that his counsel misled him as to the prison term he was facing, his claim is meritless.[7]  The general

---

[7]Defendant arguably abandoned this claim at the hearing, forgoing cross-examination of both Mr. Bird and Mr. Kogan on the subjects covered by their April 22, 2008 declarations, in which they detailed
(continued...)

rule is that an inaccurate prediction of sentence by defense counsel does not entitle a defendant to challenge his guilty plea.  See United States v. Michlin, 34 F.3d 896, 899 (9th Cir. 1994).  The only exception potentially applicable in this case is that an erroneous prediction regarding a sentence may constitute ineffective assistance if it constitutes a "'gross mischaracterization of the likely outcome' of a plea bargain and [is] 'combined with . . . erroneous advice on the probable effects of going to trial.'"  Keller, 902 F.2d at 1394 (quoting Iaea v. Sunn, 800 F.2d 861, 864-65 (9th Cir. 1986)). Defendant's Motion wholly fails to establish an Iaea exception.  As recounted above, counsel repeatedly informed Defendant of the possible sentence he was facing.  Crucially, counsel repeatedly informed Defendant that no one could guarantee him any particular sentence, and that he could be sentenced up to the ten-year statutory maximum.  That Mr. Bird and Mr. Kogan advised Defendant to consider accepting a plea on a number of occasions, counseled him on the pros and cons of taking a plea versus going to trial, and explained to him the comparative health risks attending those options is merely indicative of the high level of representation they provided Defendant throughout this case. Indeed, Defendant has identified no erroneous advice that he received regarding the probable effects of going to trial, the second element of an Iaea exception.  Furthermore, counsel's ongoing efforts to ensure that Defendant understood his legal options and their efforts to seek continuances of the trial on Defendant's behalf belies

---

[7](...continued)
the lengthy and repeated efforts they made to ensure that Defendant understood all the elements of his plea, all aspects of the sentencing process, and the full range of potential sentences.  Their testimony on these issues thus stands unrebutted.

1  Defendant's assertion that counsel somehow strong-armed him at the

2  last minute into accepting a plea agreement.

3       Defendant makes much of a letter he received from Mr. Bird in

4  November 2007, wherein Mr. Bird advised Defendant to make full

5  restitution prior to his sentencing, and opined that "you will be

6  incarcerated if restitution is not paid in full before sentencing."

7  (April 22, 2008 Bird Decl., Ex. 6.)  Defendant argues that he

8  understood this letter to mean that his paying restitution before

9  sentencing would buy him little or no prison time.  First, the letter

10  makes no such promise, especially considering counsel's advice to

11  Defendant, taken as a whole, to the effect that he faced substantial

12  jail time with or without a plea.  The letter simply suggests that if

13  Defendant failed to pay restitution by the time of sentencing, then he

14  would certainly face jail time.  Second, this letter is dated November

15  28, 2007, well after Defendant pled guilty.  As such, it could not

16  have influenced Defendant's decision to plead, which he made no later

17  than July 2007.  Although Defendant argues that this letter is

18  probative because it is representative of his "being led to believe"

19  throughout the case that he would face a light sentence, the Court

20  finds that assertion to be incredible because it is wholly

21  contradicted by the credible testimony of both attorneys.

22       Further, the weight of the evidence received at the hearing on

23  the instant Motion demonstrates that Defendant unquestionably did

24  recognize before pleading that there was a real possibility he might

25  receive a sentence close to what he eventually did receive.  Defendant

26  told Dr. Ermshar that he could be sent to prison for four years.

27  (Exh. 39, at 10 ("But in plea agreement - it CB 4 yrs in jail[.]  I

28  hope to get probation, but I worry that they are trying to make

examples to doctors & come down hard on me[.]").)   In the end, this
understanding was not far off from the 58 months Defendant ultimately
received.   Thus, even if Defendant's counsel had committed some error
in representation, there is no evidence that it had any effect on
Defendant's decision to plead guilty.   Defendant's current assertion
that he "would have refused to plead guilty and would have insisted on
going to trial" because he "never imagin[ed] that he would receive a
sentence much longer than a period of months" (Mot. at 1) is simply
not credible in the face of the evidence.

> **2.   Defendant's Plea Represented a Voluntary and Intelligent
> Choice Among the Alternative Courses of Action Open to Him.**

Nor is the Court persuaded by Defendant's assertion that his
counsel's efforts to educate and advise him were futile because of
Defendant's alleged mental impairments.   Notwithstanding the
limitations Defendant may have experienced because of his stroke and
seizure, the record shows that he was engaged throughout the plea
negotiation process, asking questions, suggesting revisions to the
factual basis, seeking better terms, selecting the count to which he
would plead, and, most tellingly, trying to negotiate for a more
favorable amount of restitution.   That Defendant was so engaged in the
entire process convinces the Court that counsel's efforts to account
for Defendant's mental deficiencies by discussing matters with him
more than once and more slowly than usual were ultimately effective.

Furthermore, that Defendant was able to function at that high a
level was supported by Dr. Ermshar's July 9, 2007 report regarding
Defendant's competence.   In this report, Dr. Ermsar found, among
other things, that Defendant "demonstrated that he was capable of
making a rational choice among rationally understood alternatives,"

26

and that he reported understanding "the nature and consequences of his plea, including the possibility that he would be incarcerated and/or receive probation with terms and conditions." (Exh. 34.)[8]  Thus, Dr. Ermshar specifically found, on June 12, 2007, that Defendant was competent to stand trial under the standard set forth in Dusky v. United States, 362 U.S. 402 (1960): "Whether the Defendant has sufficient present capacity to consult with his lawyer with a reasonable degree of rational understanding, and whether he has a rational as well as factual understanding of the proceedings against him." (Exh. 32, at 10; Exh. 45, at 4.)  As the United States Supreme Court has held, no higher or different standard of competency is required to find that a defendant is competent to plead guilty. Godinez v. Moran, 509 U.S. 389, 398 (1993).  If anything, Dr. Ermshar found that Defendant was competent under an even higher standard when she evaluated him a second time, on July 9, 2007, expressly for the purpose of determining his competency to plead: "According to the legal standard, a defendant is not competent to plead guilty if a mental disease or defect has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature and consequences of his plea." (Exh. 34, at 1;

---

[8]  With his reply, Defendant submitted another report from Dr. Ermshar, dated August 4, 2008. (Exh. 45.)  The Court notes that, in this new report, Dr. Ermshar states that Defendant's mental capacities are improved from July 2007 when Defendant accepted the guilty plea. However, whether Defendant's mental capacity has improved since his plea is simply irrelevant, because Defendant was competent when he entered a plea.  Furthermore, Dr. Ermshar restated her opinion from July 2007 that Defendant needed additional time and help to understand the consequences of pleading.  However, as discussed above, the Court finds that counsel did provide that additional assistance, and that, ultimately, Defendant understood the plea he was accepting and its consequences.

compare <u>Godinez</u>, 509 U.S. at 397-98.)  Dr. Ermshar found that under
this standard, Defendant's decision to plead guilty "would be
voluntarily and intelligently entered."  (Exh. 34, at 1.)

     Thus, Dr. Ermshar twice found that Defendant was competent, once
right before he pled guilty.  At the change of plea hearing, the Court
was satisfied that Dr. Ermshar's conclusion was correct, and that
Defendant was competent to enter a guilty plea.  Nothing in Dr.
Ermshar's testimony at the evidentiary hearing on the instant Motion
changed the Court's view regarding her conclusions.  Defendant's more
recent statements to Dr. Ermshar regarding his innocence are both
self-serving and irrelevant to the Court's inquiry.

     Finally, as described above, the Court itself apprised Defendant
of the penal consequences of his plea at the change of plea hearing
and asked numerous questions to elicit whether Defendant did, in fact,
understand the nature of the agreement.  In response, Defendant
indicated that he read the plea agreement, discussed all of its terms
with counsel, needed no more time to review it with counsel, stated
that he was satisfied with counsel's performance and representation,
and assured the Court, twice, that none of the medications he was
taking affected his mental capacity or ability to understand the
proceedings.  From its own observations of Defendant during the change
of plea hearing, the Court discerned no indications that Defendant was
misinformed or confused.  Given the entirety of the record in this
case and the ongoing and comprehensive legal advice Defendant
received, the Court concludes that Defendant well understood the
consequences of his plea and that his decision to plead represented a
voluntary and intelligent choice among the alternative courses of
action open to him.  It appears that Defendant's current attempt to

argue that his plea was not voluntary is nothing more than "buyer's remorse."  At the time he entered his guilty plea, the risks of going to trial -- including those posed both by his health and the strong case against him -- outweighed the risks of pleading guilty.  Now, his overall health improved, and the relatively favorable result of his co-defendant's trial known, the calculus has changed, and Defendant thinks he might be able to do better if allowed to take his chances before a jury.  Absent any showing of ineffective assistance of counsel, however, and in the face of a knowing and voluntary plea of guilty, Defendant does not get a second chance to play the odds.

### III.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Vacate, Set Aside, or Correct Sentence.  Defendant's ineffective assistance of counsel claim is denied **with prejudice.**

**DATED:      February 11, 2009**

_____
        **AUDREY B. COLLINS**
**CHIEF UNITED STATES DISTRICT JUDGE**